ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| NORMARIS MALDONADO SANTIAGO<br><br>Apelante<br><br>V.<br><br>HOSPITAL METROPOLITANO DE LA MONTAÑA<br><br>Apelado | TA2025AP00581 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Utuado<br><br>Caso Núm.: UT2022CV00091<br><br>Sobre: Despido ilegal e injustificado; mesada; represalias; discrimen; procedimiento sumario |

Panel integrado por su presidente, el Juez Sánchez Ramos; el Juez Pagán Ocasio y el Juez Marrero Guerrero.

Marrero Guerrero, Juez Ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 27 de marzo de 2026.

Comparece la señora Normaris Maldonado Santiago (señora Maldonado Santiago o apelante) y solicita la revisión de una *Sentencia* emitida el 10 de noviembre de 2025 por el Tribunal de Primera Instancia, Sala Superior de Utuado (TPI).[1] En dicho dictamen, el foro primario desestimó la *Querella* presentada por la apelante al concluir que no demostró que el Hospital Metropolitano de la Montaña (Hospital o apelado) incurrió en despido injustificado ni en represalias por solicitar acomodo razonable.

Con el beneficio de la comparecencia de ambas partes y de la transcripción de la prueba oral (TPO), resolvemos. Se adelanta la confirmación de la determinación apelada.

## I.

Este caso se originó el 8 de marzo de 2022, cuando la señora Maldonado Santiago presentó una *Querella* contra el Hospital mediante el procedimiento sumario de reclamaciones laborales por despido injustificado, discrimen por discapacidad y represalias.[2] En

---

[1] Entrada Núm. 89 del caso UT2022CV00091 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC). Notificada el 12 de noviembre de 2025.
[2] *Íd.*, Entrada Núm. 1 en SUMAC.

esta, alegó que laboró como enfermera graduada en el Hospital desde el 1 de julio de 2018 hasta el 10 de enero de 2022, fecha en la que adujo que fue despedida. Sostuvo que padecía de arritmia y que, ocasionalmente, experimentaba síntomas asociados que podía anticipar y que no generaban consecuencias serias.

Arguyó que solicitó acomodo razonable consistente que requirió desempeñarse en el turno de 7:00 p.m. a 7:00 a.m.; estar siempre acompañada y ser ubicada en la sala de emergencias, en lugar del área de medicina conductual. Señaló que el apelado los denegó, pese a haberlos concedido en el 2019. Adujo que, a raíz de ello, fue objeto de discrimen y represalias, como: denegación del acomodo; imponerle una licencia sin sueldo; indicarle que no había espacio en la sala de emergencias; sugerirle que renunciara y expresarle que difícilmente obtendría empleo por su condición, entre otros.

La apelante añadió que fue referida al beneficio del Seguro de Incapacidad No Ocupacional Temporal (SINOT)[3] sin solicitarlo y recibió tratamiento desde el 27 de junio hasta el 1 de noviembre de 2021. Expresó que, tras ser dada de alta y solicitar su reinstalación al empleo, se le indicó que solicitara nuevamente el aludido beneficio, pese a que su médico certificó que estaba apta para trabajar. Sostuvo que, desde entonces, permanecía desempleada debido a las actuaciones del Hospital.

En consecuencia, reclamó una mesada por despido injustificado ascendente a $10,951.54; la reinstalación al empleo, los salarios dejados de percibir; la concesión de daños no menores de $250,000.00; los honorarios de abogado, y la doble indemnización en daños y *back pay* por el discrimen por razón de discapacidad.

---

[3] Al amparo de la *Ley de beneficios por incapacidad temporal*, Ley Núm. 139 de 26 de junio de 1968, según enmendada, 11 LPRA sec. 201 *et seq.*

El 4 de abril de 2022, el Hospital contestó la *Querella* y negó la alegación de que la señora Maldonado Santiago fue objeto de despido injustificado, represalias o discrimen.[4] Expuso que, en el 2019, la apelante informó que padecía de síncope, una condición de salud no ocupacional, y solicitó laborar en el turno nocturno y siempre estar acompañada, acomodo que se concedió sujeto a revisión semestral. Expresó que, en ese año, disfrutó del beneficio bajo SINOT hasta el 14 de noviembre, tras lo cual se reintegró con el acomodo aprobado. Añadió que se benefició del referido programa del 10 al 15 de septiembre del 2020 y que se acogió a una licencia médico-familiar[5] concurrente con el beneficio bajo SINOT del 21 de julio al 1 de noviembre de 2021.

Manifestó que el 21 de octubre de 2021, la apelante solicitó un acomodo razonable mediante certificado médico consistente en un cambio al turno nocturno; permanecer siempre acompañada; ser asignada a la sala de emergencias —por el área de medicina conductual exacerbar sus síntomas—, y que se respetasen las restricciones médicas. Indicó que la mantuvo en descanso mientras evaluaba la solicitud y que el 1 de diciembre de 2021, le entregó unos documentos para extender el beneficio de SINOT.

Sostuvo que el 10 de enero de 2022, se reunió con la señora Maldonado Santiago para informarle que las recomendaciones médicas impedían conceder el acomodo razonable solicitado, ya que implicaría modificar o eliminar funciones esenciales de su puesto. Puntualizó que esta no podía laborar en la sala de emergencias, puesto que su especialidad era la medicina conductual y requería que estuviese capacitada para atender pacientes que requerían servicios de salud mental. Asimismo, expresó que no siempre era viable que permaneciera acompañada por otro empleado.

---

[4] *Íd.*, Entrada Núm. 8 en SUMAC.
[5] Al amparo del *Family and Medical Leave Act*, 29 USC sec. 2601 *et seq.* (FMLA).

El Hospital aseveró que orientó a la apelante sobre la posibilidad de solicitar nuevamente el beneficio bajo SINOT y que su empleo se reservó hasta el 19 de marzo de 2022, término dentro del cual debía comunicarse para presentar documentación, informar su situación o solicitar una reevaluación del caso. Señaló que al no realizar lo anterior, la señora Maldonado Santiago abandonó su empleo, cuya terminación ocurrió con justa causa.

Eventualmente, el TPI denegó una solicitud de sentencia sumaria presentada por el Hospital mediante una *Sentencia* emitida el 17 de agosto de 2023.[6] Determinó que persistían controversias sobre las razones y circunstancias de la terminación del empleo de la apelante, por lo que era necesario celebrar un juicio plenario.

En particular, identificó controversias sobre si la interpretación del cuestionario médico justificaba denegar el acomodo razonable y la reinstalación del empleo; si la recomendación médica de traslado constituía una restricción para atender pacientes que requerían servicios de salud mental en la sala de emergencias y eliminaba sus funciones esenciales; si el Hospital condicionó la permanencia de la apelante al solicitarle acogerse al beneficio de SINOT improcedentemente; si se configuró abandono de empleo ante su falta de comunicación, pese a que se indicó que no estaba apta para regresar, y si el Hospital incurrió en discrimen al solicitarle la renuncia por motivo de su incapacidad.

El foro primario formuló las siguientes determinaciones de hechos sobre las cuales no existía controversia sustancial:

1. La Parte Querellante tiene veintiséis (26) años.
2. La Parte Querellante es enfermera de profesión.
3. La Parte Querellante se graduó de enfermería en 2017.
4. La primera experiencia laboral de la Parte Querellante fue en el Hospital Metropolitano de la Montaña en Utuado (Parte Querellada).
5. La Parte Querellada provee servicios a pacientes de salud mental que tienen la necesidad de estabilizarse o recibir algún servicio en dicha zona.
6. La Parte Querellante comenzó a trabajar en el Hospital Metropolitano de la Montaña el 15 de junio de 2018.

---

[6] *Íd.*, Entrada Núm. 33 en SUMAC. Notificada el 17 de agosto de 2023.

7. La Parte Querellante trabajaba como empleada regular exenta, y en virtud de su clasificación, tenía asignados turnos rotativos de doce (12) horas.

8. El salario de la Parte Querellante ascendía a $2,500.00 mensuales más beneficios marginales y aportación a plan médico.

9. El 5 de febrero de 2019, la Parte Querellante presentó una solicitud de acomodo de horario de 11:00 [p.m.] a 7:00 [a.m.]

10. La Parte Querellada concedió dicha solicitud de acomodo razonable.

11. Desde el 1 de abril de 2019, la Parte Querellada fue objeto de una reestructuración de sus servicios, limitando su servicio clínico a dos áreas: Medicina Conductual y la Sala de Emergencias.

12. A raíz de dicha reestructuración, la Parte Querellada ofrece sus servicios a pacientes [psiquiátricos] en el Departamento de Medicina Conductual en el segundo piso; y en la Sala de Emergencia atiende pacientes físicos y [psiquiátricos].

13. A partir del 1 de abril de 2019, la Parte Querellante fue asignada a trabajar en el Departamento de Medicina Conductual, en turnos de doce (12) horas, de 7:00 a.m. a 7:00 p.m. o de 7:00 p.m. a 7:00 a.m.

14. Las funciones de la Parte Querellante como enfermera del Hospital Metropolitano de la Montaña consistían en:
    i. estimar signos vitales;
    ii. atender pacientes asignados;
    iii. realizar "triage";
    iv. rondas preventivas;
    v. registro corporal y registro de pertenencias a los pacientes para no hacerse daño [a sí mismos] o a otros o hacer daño a la propiedad;
    vi. aseo de pacientes;
    vii. asistencia y alta de pacientes;
    viii. traslado [del] departamento de Medicina Conductual a Sala de Emergencia, o algún otro departamento;
    ix. realizar estimado de pacientes con problemas psiquiátricos;
    x. identificar signos y síntomas del paciente psiquiátrico;
    xi. acompañar a pacientes, de ser necesario, fuera de la unidad psiquiátrica;
    xii. actualizar el plan de cuidado de los pacientes psiquiátricos según su plan de trabajo;

15. El 16 de abril de 2019, la Parte Querellante presentó una solicitud de turno para que se le permitiera trabajar en horario nocturno de 7:00 [p.m.] a 7:00 [a.m.]

16. La Parte Querellada aprobó dicha solicitud de turno.

17. El 28 de abril de 2019, la Parte Querellante entregó por primera vez a la Parte Querellada la documentación médica del Dr. Luarde Montano Soto, que identificaba su condición de "vasomotor syncope".

18. Mediante el certificado médico, el Dr. Luarde Montano Soto requería que la Parte Querellante trabajara siempre acompañada.

19. Dicho requerimiento de compañía no se trataba de que tuviera un acompañante personal, sino de que hubiese otros empleados presentes en su área de trabajo.

20. La Parte Querellante declaró que en el área de Sala de Emergencia trabajaban un mínimo de ocho (8) personas en todo momento.

21. El 17 de mayo de 2019, la Parte Querellante entregó un segundo certificado médico a la Parte Querellada, expedido por el Dr. Tomás Narváez Rodríguez, generalista, que establecía lo siguiente: "... la paciente Normaris Maldonado Santiago padece de vasomotor syncope. Se encuentra en tratamiento con electrofisiólogo cardíaco doctor Luarde I. [Montano] Soto. Se recomienda estar acompañada durante sus turnos de trabajo por cualquier incidente que pueda ocurrir. Puede [hacer] turnos nocturnos. No debe conducir vehículos de motor. Adjunto informe del electrofisiólogo."

22. En síntesis, las recomendaciones médicas de la Parte Querellante eran un turno de trabajo nocturno de 7:00 p.m. a 7:00 a.m. y estar siempre acompañada por si presenta algún síntoma.

23. A raíz de la entrega de dichas certificaciones médicas, la Parte Querellada comenzó un proceso interactivo para evaluar si se le podía conceder a la Parte Querellante la solicitud de turnos nocturnos y estar acompañada.

24. Desde el momento en que la Parte Querellante hizo la petición, se le comenzaron a dar los turnos nocturnos de manera temporera hasta tomar una determinación final.

25. El 19 de julio de 2019, la Parte Querellante informó a la Parte Querellada que cambió de médico al Dr. José Villafañe.

26. Por razón de dicho cambio de médico, la Parte Querellada le pidió a la Parte Querellante que completase un nuevo cuestionario médico a los fines de evaluar la solicitud de acomodo presentada.

27. Según el cuestionario médico preparado el 30 de julio de 2019 por el Dr. José Villafañe, al momento de su evaluación, la Parte Querellante padecía de algún impedimento físico y limitación sustancial en alguna de sus actividades mayores de vida, sin embargo, las medidas recomendadas no afectaban la habilidad de la empleada para efectuar las funciones esenciales de su empleo y podía realizarlas si se aprobase el acomodo razonable.

28. Luego de evaluar la solicitud, la Parte Querellada concedió el acomodo solicitado por la Parte Querellante para que estuviera acompañada y trabajara en turnos nocturnos por un [período] de seis (6) meses.

29. La Parte Querellante estuvo de acuerdo con la concesión de la Parte Querellada.

30. Tras una recaída en su condición ocurrida fuera de horas laborables, la Parte Querellante se acogió a una licencia médica bajo SINOT durante el [período] del 28 de octubre de 2019 al 14 de noviembre de 2019.

31. En cumplimiento con su deber de patrono, la Parte Querellada orientó a la Parte Querellante y le concedió los beneficios solicitados bajo SINOT.

32. El 1 de diciembre de 2019, luego de estar acogida a la licencia bajo SINOT, la Parte Querellante recibió un aumento de salario al igual que otros empleados de la Parte Querellada.

33. El 1 de septiembre de 2020, la Parte Querellante tuvo que ser intervenida quirúrgicamente por razón de su condición de síncope cardiaco.

34. Luego de dicho incidente de salud, la Parte Querellante solicitó nuevamente los beneficios de SINOT y la Parte Querellada la orientó al respecto.

35. Conforme a su obligación legal, la Parte Querellada le reservó el empleo a la Parte Querellante mientras estuvo acogida bajo la licencia de SINOT en dicha ocasión.

36. Los días 22 y 23 de julio de 2021, la Parte Querellante sufrió un desmayo mientras se encontraba en su hogar y acudió a recibir asistencia médica urgente.

37. El 11 de agosto de 2021, la Parte Querellante se reunió con la Sra. Solmarie Alicea, Coordinadora de Recursos Humanos [del] Hospital, y le entregó un certificado médico expedido por el Dr. Luarde Montano Soto.

38. La Parte Querellante admitió que, con posterioridad a su petición, la Parte Querellada cumplió con su deber de patrono de orientarle sobre las licencias que tenía disponibles para reservarle el empleo durante su recuperación.

39. El 11 de agosto de 2021, la Parte Querellante fue orientada de que, si no regresaba o contactaba a la supervisora en la fecha acordada para su regreso, se consideraría un abandono de empleo.

40. La Parte Querellante se acogió a una licencia y reserva de empleo, según solicitada por su médico, desde el 27 de julio de 2021 hasta el 1 de noviembre de 2021.

41. Antes de expirar el [período] de reserva de empleo bajo FMLA y SINOT, el 21 de octubre de 2021, la Parte Querellante presentó una nueva solicitud de acomodo razonable a la Parte Querellada.

42. Dicha solicitud de acomodo razonable consistía en:
    i.   turnos nocturnos, entiéndase de 7:00 [p.m.] a 7:00 [a.m.];
    ii.  estar siempre acompañada por si presenta algún síntoma;
    iii. acomodo razonable en el Departamento de Sala de Emergencias[,] ya que el Departamento de Medicina Conductual exacerba las condiciones de la paciente; y
    iv.  no intervenir en [las] restricciones.

43. En comparación con las peticiones anteriores, esta solicitud requería de un traslado de la Parte Querellante a otro departamento de la Parte Querellada.

44. El 15 de noviembre de 2021, el Dr. Luarde Montano Soto contestó el Cuestionario Médico en el cual informó que la Parte Querellante no padecía de algún impedimento físico o mental ni confrontaba alguna limitación sustancial en sus actividades mayores de vida.

45. En dicho cuestionario, el doctor Montano certificó además que, aunque la Parte Querellante sí podía realizar las funciones esenciales de su empleo si se aprobaba el acomodo razonable, las medidas recomendadas podían afectar su desempeño laboral durante y después del evento.

46. La condición de la Parte Querellante era temporera según se hizo constar en el cuestionario médico.

47. El 1 de diciembre de 2021, la Parte Querellada orientó a la Parte Querellante y le entregó los documentos para solicitar una extensión de la licencia de SINOT.

48. Mientras la solicitud de acomodo estaba en proceso de evaluación, la Parte Querellante reiteró a la Parte Querellada mediante la carta del 9 de diciembre de 2021 dirigida a la Directora de Recursos Humanos, [la] Sra. Blanca Rodríguez, sobre su disponibilidad e interés en regresar a trabajar desde el 1 de noviembre de 2021.

49. Surge del contenido de dicha comunicación lo siguiente:
"Saludos cordiales. Por este medio deseo informarle que desde el 1 de noviembre de 2021 me encuentro dispuesta a volver al área laboral y retomar mis funciones, ya que mi especialista el Dr. Luarde Montano Soto, Electrofisiólogo Cardíaco, así lo determinó a través de documentos SINOT. Por ende, quisiera saber cuál es su decisión en cuanto a mi caso y mi futuro laboral en el Hospital Metropolitano de la Montaña en Utuado, ya que no he recibido ninguna respuesta y solo se me ha ofrecido SINOT nuevamente a sabiendas que ya el médico tomó decisión. Le agradeceré su pronta atención y contestación."

50. La Parte Querellada contestó dicha carta el 13 de diciembre de 2021.

51. Mediante dicha comunicación[,] la Parte Querellada le confirmó a la Parte Querellante el recibo de la carta del 9 de diciembre de 2021 y que:
"Nos hemos comunicado con el doctor Montano Soto para obtener y clarificar información adicional que ha resultado necesaria para evaluar la solicitud de acomodo razonable presentada por usted. Esperamos poder completar la referida evaluación lo antes posible para poder presentarle una respuesta al respecto."

52. En esa misma fecha, la Parte Querellada también le envió una nueva comunicación al Dr. Luarde Montano Soto para corroborar si las restricciones solicitadas por la Parte Querellante continuaban vigentes.

53. El 20 de diciembre de 2021, el Dr. Luarde Montano Soto emitió una certificación a la Parte Querellada en la cual autorizó a la Parte Querellante a trabajar sujeto a las recomendaciones siguientes:
    i. turnos nocturnos, entiéndase de 7:00 p.m. a 7:00 a.m.
    ii. estar siempre acompañada por si presenta algún síntoma.
    iii. acomodo razonable en el [Departamento] de [Sala] de [Emergencias] ya que el [Departamento] de [Medicina Conductual] exacerba las condiciones de la paciente.
    iv. favor de no intervenir en restricciones médicas recomendadas a la empleada.

54. El *Cuestionario para evaluación de acomodo* solicitado completado y firmado por el Dr. Luarde Montano Soto el 21 de noviembre de 2021 expresa, entre otras cosas, que la Parte Querellante "puede realizar las funciones esenciales según descripción y lista de funciones esenciales."

55. El 10 de enero de 2022, la Parte Querellada le comunicó por escrito a la Parte Querellante la decisión tomada con respecto a la denegatoria de su solicitud de acomodo razonable.

56. En esa misma fecha, se llevó a cabo una reunión entre las partes de este pleito en la cual se le ofreció a la Parte Querellante los documentos para solicitar la licencia de SINOT.

57. En dicha reunión, la Parte Querellada le concedió un término hasta el 19 de marzo de 2022 para presentar los documentos de la licencia de SINOT o informar si hay algún cambio en las determinaciones médicas sobre su condición de salud.

58. Dicho término venció sin que la Parte Querellante se comunicara con la Parte Querellada al respecto.

Tras varios trámites procesales, el TPI celebró el juicio en su fondo los días 6 y 8 de mayo y 2 de junio de 2025, en el que declararon la señora Maldonado Santiago, el doctor Luarde Montano Soto, la señora Blanca Rodríguez Rivera y la señora Solmarie Alicea Santiago. A continuación, se sintetizan los testimonios.

**Normaris Maldonado Santiago**

La testigo declaró que obtuvo un bachillerato en Ciencias de Enfermería y que en el 2018 comenzó a ejercer su profesión en el Hospital, donde laboró en turnos de doce (12) horas durante tres (3) o cuatro (4) días semanales y cubrió turnos en la sala de emergencias.[7] Indicó que mantuvo buenas evaluaciones laborales y que no fue objeto de acciones disciplinarias.[8]

Atestó que trabajó en el turno nocturno, en virtud de un acomodo razonable, ya que durante el día ingería medicamentos y acudía a citas médicas.[9] Precisó que padecía de síncope vasomotor, condición que le ocasionaba episodios de desmayo, debilidad, nubosidad visual y taquicardia, los cuales no estaban asociados a actividad alguna que los exacerbara, pero que requería evitar aquellas contraindicadas por recomendación médica para prevenir recaídas.[10]

Indicó que solicitó el beneficio bajo SINOT en los años 2019, 2020 y 2021.[11] Manifestó que el 15 de enero de 2020, se reunió con las señoras Luz Morales y Virmaeli Pérez, quienes le notificaron un cambio al turno diurno. Expuso que advirtió que dicha modificación afectaba su acomodo razonable, vigente hasta diciembre de 2019,

---

[7] TPO del 6 de mayo de 2025, pág. 16, líneas 17-22; pág. 17, líneas 1-18; pág. 96, líneas 15-20.

[8] *Íd.*, pág. 37, líneas 19-25; pág. 39, líneas 3-8.

[9] *Íd.*, líneas 20-25; pág. 18, líneas 1-6.

[10] *Íd.*, pág. 18, líneas 14-15; pág. 118, líneas 18-25; pág. 119, líneas 1-24; ; pág. 120, líneas 1-11.

[11] *Íd.*, pág. 136, líneas 15-25; pág. 137, líneas 1-24; pág. 138, líneas 1-25; pág. 139, líneas 1-22.

ante lo cual respondieron que no podía continuar laborando bajo esas condiciones y le sugirieron que renunciara y buscara otro empleo.[12] Señaló que el 20 de enero de 2020, remitió una carta a la señora Luz Morales en la que calificó el trato recibido como hostil y despectivo hacia su situación y sostuvo que el cambio de turno no respondía a una búsqueda de alternativas, sino a inducir su renuncia.[13] Atestiguó que, en respuesta, la señora Luz Morales reiteró que renunciara por no poder desempeñarse en el Hospital bajo sus condiciones.[14] Añadió que las supervisoras se disculparon posteriormente y que no existía una minuta que recogiera sus expresiones.[15] Puntualizó que, tras la entrega de la carta, le restituyeron el turno nocturno.[16]

Reconoció que, mediante una solicitud de licencia bajo el FMLA junto con los beneficios de SINOT, se le concedió reserva de empleo hasta el 1 de noviembre de 2021, sujeta a que se reintegrara o se comunicara con su supervisor, bajo apercibimiento de considerarse abandono de empleo.[17] Relató que el 22 de octubre de 2021, entregó las recomendaciones del doctor Montano Soto, quien la consideró apta para trabajar con las restricciones de turno nocturno, estar siempre acompañada, trasladarla del área de medicina conductual y que no se interviniera en dichas restricciones médicas.[18] Vinculó el conflicto con el Hospital con la solicitud del traslado y requerirse que no se interfiriera con las restricciones médicas.[19]

Declaró que sus médicos, los doctores Villafañe y Montano Soto, recomendaron que fuese asignada al turno nocturno y que siempre estuviese acompañada por si presentaba algún síntoma.[20] Expuso que el doctor Villafañe certificó que podía realizar las

---

[12] *Íd.*, pág. 23, líneas 16-24; pág. 24, líneas 1-2; pág. 129, líneas 11-25; pág. 130, línea 1.
[13] *Íd.*, pág. 26, líneas 2-3; pág. 28, líneas 5-25; pág. 29, líneas 1-3.
[14] *Íd.*, pág. 29, líneas 16-22.
[15] *Íd.*, pág. 34, líneas 4-6; pág. 133, líneas 5-12.
[16] *Íd.*, pág. 135, líneas 20-23.
[17] *Íd.*, pág. 152, líneas 12-25; pág. 153, líneas 1-20.
[18] *Íd.*, líneas 17- 24; pág. 120, líneas 12-19; pág. 122, líneas 9-24; pág. 123, líneas 1-25; pág. 124, líneas 1-24; pág. 125, líneas 1-6; pág. 156, líneas 6-16; pág. 157, líneas 1-3.
[19] *Íd.*, pág. 143, líneas 17-24; pág. 144, líneas 1-4.
[20] *Íd.*, pág. 60, líneas 23-24; pág. 61, líneas 1-9.

funciones esenciales de su puesto aunque tenía una condición de salud que afectaba una parte sustancial de su vida.[21] A su vez, indicó que el doctor Montano Soto consignó en el cuestionario que no presentaba una condición cualificada bajo la Ley ADA ni limitaciones sustanciales en sus actividades principales de la vida.[22] Añadió que también indicó que podía desempeñar las funciones esenciales de su puesto, sujeto al acomodo razonable solicitado.[23] Afirmó que el Hospital requirió aclaración al galeno al entender que la información proporcionada era incompatible.[24] Apuntó que el médico precisó que debía estar acompañada en caso de presentar síntomas, aunque dicha recomendación podía variar si transcurrían más de seis (6) meses sin episodios de síncope.[25]

Relató que el 1 de diciembre de 2021, el Hospital le informó que continuaba evaluando la información médica y que requería datos adicionales.[26] Reconoció que, para esa fecha, su reserva de empleo había expirado y que se le solicitó acogerse nuevamente al beneficio bajo SINOT mientras se completaba el análisis y que, pese a no realizarlo, no la despidieron en ese momento.[27] Esgrimió que el 9 de diciembre de 2021, requirió su reinstalación al puesto, ya que su médico la autorizó a trabajar, aunque admitió que el Hospital debía culminar el proceso interactivo para asegurarse de que pudiera ejercer sus funciones sin representar un riesgo.[28] Aclaró que el acomodo razonable no implicaba la presencia continua de una persona consigo, sino la disponibilidad de personal en el área.[29] Indicó que el 13 de diciembre de 2021, la señora Rodríguez Rivera le notificó que el Hospital continuaba evaluando la información médica

---

[21] *Íd.*, pág. 61, líneas 19-25; pág. 62, líneas 1-5; pág. 63, líneas 23-25.
[22] *Íd.*, pág. 160, líneas 7-20; pág. 163, líneas 22-25; pág. 164, líneas 1-25; pág. 165, líneas 1-3.
[23] *Íd.*, líneas 24-25; pág. 191, líneas 1-23.
[24] *Íd.*, pág. 166, líneas 17-25.
[25] *Íd.*, pág. 190, líneas 6-15.
[26] *Íd.*, pág. 167, líneas 2-9.
[27] *Íd.*, líneas 10-24; pág. 168, líneas 1-24; pág. 169, líneas 1-24.
[28] *Íd.*, pág. 170, líneas 8-17; pág. 172, líneas 23-24; pág. 177, líneas 7-19.
[29] *Íd.*, pág. 90, líneas 17-25; pág. 91, líneas 1-2.

y que requería obtener datos adicionales para atender la solicitud de acomodo razonable.[30] Explicó que el médico especificó que sus expresiones se referían a que el Hospital no debía intervenir con sus restricciones médicas, lo que la testigo interpretó como que el apelado no podía evaluar acomodos alternos.[31]

Expuso que el 10 de enero de 2022, se reunió con la señora Rodríguez Rivera, el señor Tomás López y la señora Alicea Santiago para discutir el acomodo razonable. Sostuvo que era incorrecto denegarlo por no poder garantizarle que estuviera acompañada, ya que en el turno nocturno laboraban al menos ocho (8) personas en la sala de emergencias.[32] Manifestó que la señora Rodríguez Rivera le recomendó asesorarse con la Oficina de Seguro Social, al entender que difícilmente podría obtener un empleo por sus condiciones y que no tenía cabida en el Metro Pavía Health System.[33] Añadió que, en cinco (5) ocasiones, esta le requirió su bonita carta de renuncia y que, al intentar explicar que se encontraba apta para trabajar, le verbalizó que la decisión ya estaba tomada.[34] Puntualizó que esta le expresó que tenía noventa (90) días para gestionar la carta de renuncia.[35] Aclaró que, en el referido término que concluía el 19 de marzo de 2022, podía solicitar información adicional a su médico o acogerse al SINOT para extender la reserva de empleo hasta marzo de 2023.[36]

Sin embargo, admitió que no solicitó el beneficio por considerarlo fraudulento, ya que su médico la dio de alta, no notificó cambios en su situación, ni realizó gestión ulterior.[37] Sostuvo que las expresiones de la señora Rodríguez Rivera no fueron avaladas por evidencia médica que justificara su inhabilidad para trabajar o

---

[30] *Íd.*, líneas 23-25; pág. 173, líneas 1-25; pág. 174, líneas 1-5; pág. 175, líneas 1-16.
[31] *Íd.*, pág. 176, líneas 1-24; pág. 177, líneas 1-10.
[32] *Íd.*, pág. 93, líneas 10-22.
[33] *Íd.*, pág. 96, líneas 21-25; pág. 97, líneas 1-25.
[34] *Íd.*, pág. 98, líneas 1-5; pág. 101, líneas 4-17.
[35] *Íd.*, líneas 10-15; pág. 102, líneas 16-23.
[36] *Íd.*, pág. 179, líneas 8-25; pág. 180, líneas 1-14.
[37] *Íd.*, líneas 15-24; pág. 104, líneas 6-13; pág. 181, líneas 1-4; pág. 183, líneas 5-16.

atender pacientes que requerían servicios de salud mental.[38] Además, afirmó que no presentó una queja formal por las expresiones relativas a la renuncia.[39] Pero, reconoció que la señora Rodríguez Rivera no la despidió, sino que le extendió el período para reintegrarse, durante el cual no regresó ni mantuvo comunicación adicional.[40]

Expresó que, tras la pérdida de su única fuente de ingreso, tuvo que depender de sus progenitores.[41] Relató que las expresiones de la señora Rodríguez Rivera permanecieron constantemente en su mente al punto de no poder conciliar el sueño.[42] Sostuvo que fue tratada como una persona impedida y como si hubiese sido una empleada deficiente.[43] Añadió que nunca anticipó que la solicitud de un acomodo razonable culminaría en la terminación de su empleo.[44] Atestó que, más allá de la pérdida de ingresos, no contaba con evidencia documental que acreditara daños como consecuencia de su decisión de no regresar al empleo.[45]

Declaró que, desde el 24 de enero de 2025, laboraba como enfermera en la misma sala de emergencia, entonces operada por Utuado Health Hospital, la cual funcionaba únicamente en el turno diurno.[46] Testificó que atendía pacientes que requerían servicios de salud física y mental, quienes llegaban más desestabilizados a la sala de emergencias y posteriormente eran referidos al área de medicina conductual del Hospital para recibir tratamiento.[47] Detalló que, entre sus funciones, se encontraban las labores de triage, rondas preventivas, revisión corporal y de pertenencias de los pacientes para prevenir riesgos, entre otras.[48]

---

[38] *Íd.*, líneas 5-16.
[39] *Íd.*, pág. 183, líneas 17-24; pág. 184, líneas 1-25; pág. 185, líneas 1-2.
[40] *Íd.*, pág. 186, líneas 2-20.
[41] *Íd.*, pág. 106, líneas 7-22.
[42] *Íd.*
[43] *Íd.*
[44] *Íd.*, pág. 107, líneas 14-17.
[45] *Íd.*, líneas 8-14.
[46] *Íd.*, pág. 105, líneas 9-23; pág. pág. 200, líneas 15-24; pág. 201, líneas 1-24.
[47] *Íd.*, pág. 105, líneas 9-23; pág. 112, líneas 17-25; pág. 113, líneas 1-14; pág. 115, líneas 17-24; pág. 200, líneas 21-24; pág. 201, líneas 1-24.
[48] *Íd.*, pág. 116, líneas 5-25; pág. 117, líneas 1-22.

**Luarde Montano Soto**

El testigo declaró que ejercía como electrofisiólogo desde el año 2009 y que la apelante estuvo bajo su cuidado tras ser referida por episodios de pérdida de conocimiento.[49] Explicó que le diagnosticó síncope vasodepresor, condición incurable caracterizada por episodios impredecibles de pérdida de conocimiento, aun cuando la persona se encontrase aparentemente estable, pierde la postura y puede permanecer no responsiva por unos minutos.[50] Señaló que, como resultado del tratamiento, la paciente había mejorado, aunque ocasionalmente presentaba mareo y pérdida de conocimiento.[51]

Indicó que mediante certificado médico del 21 de octubre de 2020, se consignó que esta podía reintegrarse a sus funciones laborales, sujeto a unas recomendaciones.[52] Entre ellas, la asignación de turnos; estar acompañada ante la posibilidad de episodios; su traslado del área de medicina conductual para evaluar si propiciaba una mejoría adicional en su condición, ya que la exposición a tensión podía ser un detonante para el síncope, y la no intervención con las restricciones médicas.[53]

En relación con la recomendación de traslado a sala de emergencias, explicó que respondía al objetivo de ubicarla en un entorno de menor estrés, dado que el área de medicina conductual podía exacerbar su condición.[54] Concretó que no evaluó otras áreas dentro del Hospital, pero entendía que la sala de emergencias, por su naturaleza, recibía pacientes, tenía labores específicas prolongadas, entre otros cuidados directos.[55] Esgrimió que su recomendación se basó en la información proporcionada por la apelante y en que los

---

[49] TPO del 8 de mayo de 2025, pág. 7, líneas 23-25; pág. 8, líneas 1-20.
[50] *Íd.*, pág. 11, líneas 16-19; pág. 12, líneas 1-18; pág. 14, líneas 20-25; pág. 15, líneas 1-25.
[51] *Íd.*, pág. 17, líneas 13-23; pág. 18, líneas 1-12.
[52] *Íd.*, pág. 21, líneas 2-25; pág. 22, líneas 2-25; pág. 23, líneas 1-23.
[53] *Íd.*
[54] *Íd.*, pág. 80, líneas 15-25; pág. 81, líneas 1-2; pág. 82, líneas14-17; pág. 85, líneas 3-23.
[55] *Íd.*, pág. 127, líneas 15-25; pág. 128, líneas 1-8.

estresores podían exacerbar la condición, aunque esta podía sobrevenir en cualquier momento.[56]

En cuanto al cuestionario, expresó que consignó que la apelante podía ejecutar las funciones esenciales de su puesto conforme a la descripción provista si se aprobaba el acomodo razonable solicitado, cuya duración debía evaluarse conforme a su mejoría.[57] Precisó, además, que contestó que las medidas recomendadas podían afectar positiva o negativamente su habilidad para efectuar las funciones esenciales de su empleo, y que se podía afectar su habilidad durante y después del evento.[58] Indicó que clasificó la condición como temporera ante la ausencia de la categoría más adecuada en el cuestionario, ya que era intermitente.[59]

Testificó que la apelante estaba cognitiva y funcionalmente bien.[60] No obstante, subrayó que, debido al carácter intermitente del síncope, recomendó que se conociera su ubicación, de manera que, de sobrevenir un episodio, pudiera recibir asistencia, tras lo cual se recuperaba y continuaba sus labores.[61] Manifestó que contestó que su condición no constituía un impedimento físico o mental, según los términos dispuestos en el cuestionario, ni implicaba una limitación bajo la Ley ADA, ni una limitación sustancial de las actividades principales de la vida, al tratarse de un evento intermitente, impredecible e involuntario.[62] Apuntó que, al completar el cuestionario, limitó la recomendación de acomodo razonable a que la apelante estuviera acompañada, sin reiterar las demás sugerencias contenidas en su certificación médica inicial.[63]

---

[56] *Íd.*, pág. 82, líneas 8-12; pág. 86, líneas 15-23; pág. 87, líneas 19-23.
[57] *Íd.*, pág. 37, líneas 22-25; pág. 38, líneas 1-2; pág. 40, líneas 3-10.
[58] *Íd.*, pág. 29, líneas 20-25; pág. 31, líneas 19-25; pág. 32, líneas 13-21.
[59] *Íd.*, pág. 39, líneas 9-25.
[60] *Íd.*, pág. 42, líneas 11-25; pág. 43, líneas 1-25.
[61] *Íd.*, pág. 43, líneas 12-15.
[62] *Íd.*, pág. 64, líneas 1-24; pág. 65, líneas 24-25; pág. 66, líneas 1-5; pág. 68, líneas 16-18; pág. 98, líneas 2-25; pág. 99, líneas 1-25; pág. 100, líneas 1-19.
[63] *Íd.*, pág. 102, líneas 13-22; pág. 106, líneas 16-25; pág. 107, líneas 1-12.

**Blanca Rodríguez Rivera**

La testigo declaró que, desde el año 2022, se desempeñaba como directora de recursos humanos del Sistema de Salud Menonita.[64] Señaló que, entre los años 2012 al 2022, laboró como directora regional de recursos humanos del Metro Pavía Health System, período durante el cual asesoró al Hospital Metropolitano Dr. Susoni, al Hospital Pavía de Arecibo, al Hospital Metropolitano de la Montaña y al Hospital Perea en Mayagüez.[65] Precisó que, en dichas instituciones, supervisaba los procesos de recursos humanos y orientaba al personal encargado sobre políticas, investigaciones, medidas disciplinarias, beneficios y acomodos razonables.[66]

Indicó que conocía a la apelante como empleada del Hospital.[67] Relató que el 21 de octubre de 2021, recibieron un certificado médico que ampliaba las recomendaciones previamente evaluadas, ya que añadía la solicitud de ubicar a la apelante en la sala de emergencias, debido a que su condición se exacerbaba en el área de medicina conductual, así como no intervenir con las restricciones médicas. [68] Señaló que tales recomendaciones motivaron la necesidad de obtener información adicional.[69]

Explicó que la recomendación de que la apelante permaneciera siempre acompañada requería evaluar si podía desempeñar sus funciones esenciales sin comprometer su seguridad, la del personal y la de los pacientes. [70] Detalló que, en el área de medicina conductual, los empleados permanecían mayormente agrupados, lo que facilitaba el acompañamiento del apelante en el turno nocturno.[71] Añadió que, en contraste, el personal de enfermería se movilizaba prácticamente solo en la sala de emergencias,

---

[64] *Íd.*, pág. 137, líneas 11-15; pág. 138, líneas 3-5; pág. 140, líneas 4-12.
[65] *Íd.*, pág. 139, líneas 14-25; pág. 140, línea 1; pág. 141, líneas 4-14.
[66] *Íd.*, pág. 141, líneas 15-25; pág. 142, líneas 1-7.
[67] *Íd.*, pág. 142, líneas 8-19.
[68] *Íd.*, pág. 145, líneas 16-25; pág. 146, líneas 1-15.
[69] *Íd.*
[70] *Íd.*, pág. 146, líneas 17-25; pág. 147, líneas 1-20.
[71] *Íd.*, pág. 146, líneas 17-25; pág. 147, líneas 1-20.

especialmente en el área de triage, donde el enfermero atendía al paciente de forma individual.[72]

A su vez, detalló que el área de medicina conductual contaba con un psiquiatra o médico evaluador hasta las 11:00 p.m., por lo que, todo paciente se atendía y se evaluaba conductualmente en la sala de emergencia hasta las 11:00 a.m.[73]

Indicó que la utilización del término "siempre" en el certificado médico resultó determinante para el análisis, ya que dificultaba el acomodo en la sala de emergencias.[74] Expuso que la indicación de que el área de medicina conductual exacerbaba la condición de la apelante también generó preocupación, dado que el Hospital se dedicaba al área de salud mental y que, aunque el volumen de pacientes en el turno nocturno en la sala de emergencias podía ser menor, se atendían situaciones más críticas de salud mental y accidentes.[75] Testificó que, al recibir pacientes en crisis, el personal de enfermería en sala de emergencias debía brindar atención y, en ocasiones, aplicar restricciones, lo cual implicaba un esfuerzo físico.[76] Al respecto, indicó que, en un cuestionario, la apelante manifestó que entendía que no podía realizar esfuerzo físico sola.[77]

Puntualizó que, al evaluar las recomendaciones médicas, concluyeron que no era viable conceder el acomodo solicitado, debido a que las funciones esenciales del puesto requerían disponibilidad para atender pacientes de forma individual o acompañada, realizar rondas y efectuar esfuerzos físicos cuando fuese necesario, sin excluir a los pacientes que requerían servicios de salud mental.[78] Reconoció que el médico de la apelante indicó en el cuestionario que esta podía desempeñar las funciones esenciales de su puesto conforme a la

---

[72] *Íd.*, pág. 148, líneas 2-24; pág. 149 líneas 1-25; pág. 150, líneas 1-10.
[73] *Íd.*, pág. 164, líneas 1-25; pág. 165, líneas 1-2.
[74] *Íd.*, pág. 150, líneas 11-17; pág. 161, líneas 20-25; pág. 162, líneas 1-17.
[75] *Íd.*, líneas 17-25; pág. 151, líneas 1-23; pág. 167, líneas 2-15.
[76] *Íd.*, pág. 153, líneas 8-25; pág. 154, líneas 1-23; pág. 158, líneas 19-25; pág. 159, líneas 1-23.
[77] *Íd.*
[78] *Íd.*, pág. 179, líneas 1-20.

descripción provista, incluyendo el cuidado de enfermería y el tratamiento de un paciente que requería servicios de salud mental.[79]

Manifestó que, durante la reunión del 10 de enero de 2022, no se le informó a la apelante que estaba despedida ni se le solicitó renunciar o que redactara una carta bonita de renuncia, sino que se le ofreció tiempo adicional para que auscultara alternativas con su médico y evaluar posibles cambios en las recomendaciones.[80] Añadió que era posible que la apelante le expresara que no podía acogerse al SINOT por haber recibido el alta médica.[81] Finalmente, indicó que dejó de trabajar con el patrono en febrero y que, por ello, desconocía los eventos ocurridos con posterioridad.[82]

**Solmarie Alicea Santiago**

La testigo manifestó que, entre los años 2018 y 2023, se desempeñó como coordinadora de recursos humanos en el Hospital, donde tenía a su cargo la preparación de nóminas, elaboración de informes y la gestión de procesos disciplinarios, así como la tramitación de beneficios bajo SINOT y otras licencias protegidas.[83] Precisó que para acceder al beneficio de SINOT se requería la certificación médica de un período de incapacidad.[84]

Señaló que la apelante se encontraba bajo licencia y no se reincorporó dentro del término establecido.[85] En relación al acomodo razonable solicitado en octubre de 2021, explicó que, tras recibir la documentación médica, inició un proceso interactivo con la apelante y su médico para aclarar las recomendaciones.[86] No obstante, reconoció que el médico no estableció restricción alguna en cuanto al tipo de pacientes que la apelante podía atender en la sala de

---

[79] *Íd.*, pág. 218, líneas 19-23; pág. 1-25.
[80] *Íd.*, pág. 182, líneas 11-14; pág. 186, líneas 1-24; pág. 187, líneas 1-24; pág. 188, líneas 1-15, pág. 189, líneas 11-25; pág. 190, líneas1-4; pág. 231, líneas 7-21.
[81] *Íd.*, pág. 199, líneas 15-21.
[82] *Íd.*, pág. 192, líneas 20-21; pág. 193, líneas 12-23.
[83] TPO del 2 de junio de 2025, pág. 9, líneas 7-14; pág. 10, líneas 8-15
[84] *Íd.*, pág. 31, líneas 23-24; pág. 32, líneas 1-3.
[85] *Íd.*, pág. 10, líneas 16-24; pág. 11, líneas 1-4.
[86] *Íd.*, pág. 11, líneas 11-13; pág. 12, líneas 9-24; pág. 13, líneas 1-17; pág. 15, líneas 18-24; pág. 17, líneas 1-12.

emergencias.[87] Además, afirmó que recibió la carta de la apelante, fechada el 1 de diciembre de 2021, en la que manifestó su disposición a reintegrarse a sus funciones tras la autorización de su médico, pese a lo cual le continuaron ofreciendo el beneficio de SINOT.[88]

Expuso que, a partir de la información disponible, concluyeron que el acomodo solicitado no resultaba viable, dado que el Hospital se especializaba en salud mental y que, conforme a las recomendaciones médicas, la apelante no podía trabajar con pacientes que requerían servicios de salud mental.[89] Indicó que el traslado a sala de emergencias tampoco era factible, puesto que no podían garantizar que la apelante estuviera acompañada en todo momento.[90]

Señaló que tal determinación fue comunicada a la apelante en enero de 2022, ocasión en la que se le orientó sobre la posibilidad de acogerse al beneficio de SINOT por si las recomendaciones del médico cambiaban.[91] Precisó que la apelante no estableció comunicación durante el período concedido ni solicitó el beneficio.[92]

En cuanto a la carta remitida por la apelante, en la que expresó que recibió un trato hostil y de desprecio por parte de las señoras Luz Morales y Virmaeli Pérez y que estas le sugirieron renunciar, la testigo planteó que no realizó gestión alguna por entender que no constituyó una queja ni estuvo presente en la reunión.[93] Indicó que, a pesar de que recibió la carta como empleada del área de recursos humanos, no recordó quién la entregó y los empleados tenían que presentar la queja por escrito en la oficina de recursos humanos.[94]

---

[87] *Íd.*, pág. 52, líneas 15-19.
[88] *Íd.*, pág. 49, líneas 10-25; pág. 50, líneas 1-20.
[89] *Íd.*, pág. 18, líneas 18-25; pág. 19, líneas 1-6; pág. 20, líneas 5-23.
[90] *Íd.*
[91] *Íd.*, pág. 21, líneas 11-24; pág. 22, líneas 4-12; pág. 23, líneas 1-12.
[92] *Íd.*, pág. 24, líneas 17-25.
[93] *Íd.*, pág. 39, líneas 8-24; pág. 40, líneas 1-24; pág. 41, líneas 1-25; pág. 42, líneas 1-25; pág. 43, líneas 1-14; pág. 44, líneas 3-11; pág. 45, líneas 22025; pág. 46, líneas 1-24; pág. 47, líneas 1-3.
[94] *Íd.*, pág. 64, líneas 16-25; pág. 65, líneas 1-3.

Sometido el asunto ante su consideración, el 10 de noviembre de 2025, el TPI emitió una *Sentencia* en la que denegó y desestimó en sus méritos con perjuicio la *Querella* presentada por la apelante.[95] El foro primario reseñó que el 21 de octubre de 2021, cuando la señora Maldonado Santiago solicitó el acomodo razonable se encontraba acogida a licencia bajo FMLA y el beneficio de SINOT por su condición de síncope vasomotor, sin haber expirado la reserva de empleo. Expresó que, tras su alta médica, la reinstalación no operaba de forma automática, sino que dependía de que estuviera física y mentalmente apta para ocupar su puesto, mientras se evaluaba la recomendación médica de trasladarla a la sala de emergencias. Indicó que la apelante reconocía que, aun cuando su médico evaluó su condición de salud y emitió sus recomendaciones, correspondía al Hospital determinar si procedía su reinstalación con un acomodo razonable o si dicha reinstalación representaba un riesgo para su salud y de los pacientes bajo su cuidado.

Planteó que el médico sostuvo que la condición de la apelante era intermitente, detonada por estrés, y que esta podía ejercer sus funciones mientras no presentara episodios de síncope. Empero, el Tribunal otorgó mayor credibilidad al testimonio de la señora Rodríguez Rivera por su conocimiento directo de la dinámica operacional del Hospital. Esta explicó que, en el turno nocturno de la sala de emergencias, el personal de enfermería trabajaba sin acompañantes, atendía pacientes más inestables y se desplazaba entre áreas distantes, lo que implicaba un riesgo para la apelante y los pacientes bajo su cuidado ante un episodio de síncope.

El Tribunal *a quo* concluyó que el acomodo razonable solicitado resultaba incompatible con las funciones esenciales del puesto de la apelante y que su concesión implicaría limitar sus funciones, por lo

---

[95] Entrada Núm. 89 en SUMAC. Notificada el 12 de noviembre de 2025.

que avaló su denegatoria. En consecuencia, determinó que no se configuró una actuación discriminatoria por incapacidad ni una violación al derecho de reinstalación. Asimismo, resolvió que la concesión de noventa (90) días adicionales sin atribución a licencia no constituyó un condicionamiento indebido, sino una medida para preservar el empleo ante la posibilidad de cambios médicos. Por último, consignó que no se configuró un despido constructivo, ya que la apelante no se comunicó con el Hospital dentro del término concedido para informar algún cambio en su condición o solicitar los beneficios de SINOT. Añadió que, en atención a lo anterior, tampoco medió alguna acción constitutiva de represalias por solicitar el último acomodo razonable, y que, ante la improcedencia de las causas de acción, tampoco procedía la compensación por los daños reclamados.

Inconforme, el 21 de noviembre de 2025, la señora Maldonado Santiago presentó su recurso de apelación, en el que señaló que el TPI incurrió en los siguientes errores:

1. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DICTAR SENTENCIA DE DESESTIMACIÓN MEDIANDO PASIÓN, PREJUICIO, PARCIALIDAD Y ERROR MANIFIESTO. LA DOCTRINA DE DEFERENCIA JUDICIAL CEDE CUANDO LA APRECIACIÓN DE LA PRUEBA NO REPRESENTA EL BALANCE MÁS RACIONAL, JUSTICIERO Y JURÍDICO DE LA TOTALIDAD DE LA PRUEBA COMO OCURRE EN ESTE CASO. UNA APRECIACIÓN ERRÓNEA DE LA PRUEBA NO TIENE CREDENCIALES DE INMUNIDAD FRENTE A LA FUNCIÓN REVISORA DEL FORO APELATIVO (VÉASE: VIUDA DE MORALES VS. DE JESÚS TORO, 107 DPR 826 (1978) Y DÁVILA NIEVES VS[.] MELÉNDEZ MARÍN[,] 2013 TSPR 12).

2. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR QUE LA APELANTE NO FUE DISCRIMINADA POR RAZÓN DE IMPEDIMENTO CUANDO SE DENEGÓ EL ACOMODO A BASE DE UNA INTERPRETACIÓN DEL APELADO DEL CERTIFICADO MÉDICO AUN CUANDO EL DR. MONTANO, TANTO POR ESCRITO COMO DE FORMA [TESTIFICAL CERTIFICÓ] QUE ESTA PODÍA REALIZAR LAS FUNCIONES ESENCIALES DEL PUESTO Y LA APELANTE ACTUALMENTE [ESTÁ] TRABAJANDO EN LA MISMA SALA DE EMERGENCIAS DONDE EL APELADO DECÍA QUE NO PODÍA TRABAJAR, ENTRE [OTROS] HECHOS QUE CONTRADICEN SUS HALLAZGOS.

3. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR QUE NO HUBO REPRESALIAS CUANDO A LA APELANTE LA DEJARON FUERA POR EJERCER SU DERECHO DE SOLICITAR ACOMODO

RAZONABLE Y POR RECLAMAR SU DERECHO A SER REINSTALADA BAJO SINOT (11 LPRA 203Q).

Tanto en su escrito principal, como en el alegato suplementario presentado el 11 de febrero de 2026, la apelante planteó que el foro apelado incurrió en errores sustanciales de hecho y de derecho al analizar la figura de despido constructivo, a pesar de que nunca la invocó ni renunció a su empleo. Sostuvo que el TPI aplicó incorrectamente la presunción de discrimen de la *Ley Antidiscrimen de Puerto Rico*, Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 LPRA sec. 146 *et seq.*, aun cuando se eliminó por la *Ley de Transformación y Flexibilidad Laboral*, Ley Núm. 4-2017, según enmendada, 29 LPRA sec. 121 *et seq.*

Asimismo, argumentó que el TPI erró al concluir que no existía evidencia de una minuta u otro documento en el que constara que sus supervisoras le solicitaron la renuncia, pese a que se admitió en evidencia una carta en la que denunció comentarios discriminatorios y solicitudes de renuncia relacionadas con su impedimento, además de su testimonio bajo juramento sobre expresiones similares durante reuniones posteriores. Sostuvo que el foro apelado otorgó credibilidad indebida a la interpretación de la directora de recursos humanos sobre el certificado médico sin consultar con un galeno, aun cuando sus médicos que la evaluaron determinaron que podía realizar las funciones esenciales de su puesto con acomodo razonable. También, planteó que el tribunal de instancia no consideró que el acomodo solicitado era temporero por aproximadamente seis (6) meses.

Añadió que la determinación de denegar el acomodo razonable fue arbitraria, ya que solicitó ser trasladada a la sala de emergencias, donde, según planteó, atendía pocos pacientes que requerían servicios de salud mental y siempre trabajaba acompañada. Manifestó que el TPI concluyó que no podía garantizarse que estuviera siempre acompañada en la sala de emergencias, en contra

de su determinación de que dicha área operaba con, al menos, ocho (8) empleados. A su vez, señaló que continuó laborando en la misma sala de emergencias donde el Hospital sostuvo que no podía trabajar, atendiendo a pacientes que requerían servicios de salud física y mental, por lo que podía desempeñar las funciones esenciales del puesto. Esgrimió que solicitó su reinstalación tras recibir el alta médica. Finalmente, alegó que su condición era tratable y que todos los médicos concluyeron que podía trabajar con acomodo razonable.

Por su parte, el 11 de marzo de 2026, el Hospital presentó su alegato en el que argumentó que la apelante no demostró que el TPI incurrió en pasión, prejuicio, parcialidad o error manifiesto, y que se limitó a discrepar de la apreciación de la prueba y la adjudicación de credibilidad del foro primario, las cuales merecían deferencia.

El apelado arguyó que la señora Maldonado Santiago no fue objeto de discrimen ni de represalias, y que la denegatoria del último acomodo razonable obedeció a que implicaba eliminar funciones esenciales del puesto de enfermera, particularmente la atención de pacientes que requerían servicios de salud mental y ante la imposibilidad de garantizar que trabajara siempre acompañada. Sostuvo que las funciones esenciales se realizaban tanto en el área de medicina conductual como en la sala de emergencias, y que los pacientes recibidos en esta podían encontrarse en estado crítico, lo que representaba un riesgo ante la condición de la apelante.

Asimismo, indicó que no hubo despido injustificado, sino abandono de empleo, ya que, tras denegarse el acomodo solicitado, a la señora Maldonado Santiago se le ofreció la alternativa de solicitar el beneficio de SINOT para reservar su empleo, concediéndole un término para presentar documentación o comunicar cambios en su condición, sin que realizara gestión alguna.

Finalmente, precisó que la apelante había recibido varios acomodos razonables y licencias, lo que evidenciaba la ausencia de

discrimen. Añadió que el médico no justificó el acomodo solicitado y reconoció desconocer la operación hospitalaria.

## II.

### A. Apreciación de la prueba

Como norma general, un foro apelativo concede gran deferencia a las determinaciones de hechos y a la adjudicación de credibilidad del TPI, las cuales están revestidas de una presunción de corrección. *Santiago Maldonado v. Alvelo Rivera*, 2026 TSPR 14, 217 DPR ___ (2026). Ello obedece a que el tribunal de instancia se encuentra en mejor posición para aquilatar la prueba testifical, al observar directamente el comportamiento de los testigos y escuchar su voz. *Íd.; Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779 (2022); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Por ello, en ausencia de error manifiesto, pasión, prejuicio o parcialidad, no procede intervenir con dichas determinaciones. *Íd.; Pueblo v. Hernández Doble*, 210 DPR 850, 866 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

Se incurre en pasión, prejuicio o parcialidad cuando el juzgador actúa movido por inclinaciones personales que afectaban su juicio, mientras que el error manifiesto surge cuando la apreciación de la prueba se aparta del balance más racional de la evidencia o resulta inherentemente imposible o increíble. *Ortiz Ortiz v. Medtronic*, *supra*. Así, la intervención apelativa procede cuando no exista base suficiente que sostenga las determinaciones del TPI, ya que meras diferencias de criterio no justifican su revisión. *Íd.*, pág. 780.

### B. Despido injustificado

El Estado posee un interés apremiante en regular las relaciones obrero-patronales para evitar prácticas laborales injustas y garantizar la protección de los derechos de los empleados. *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 374 (2001). Así, la *Ley sobre Despidos Injustificados*, Ley Núm. 80 de 30 de mayo de 1976, según

enmendada, 29 LPRA sec. 185a *et seq.*, persigue desalentar los despidos arbitrarios mediante la imposición de remedios económicos. *Ruiz Mattei v. Commercial Equipment*, 214 DPR 407 (2024); *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019).

Conforme al Artículo 1 de la referida Ley*, supra*, sec. 185a, todo empleado remunerado, contratado sin tiempo determinado y despedido sin justa causa, tendrá derecho a una indemnización o mesada. *Ortiz Ortiz v. Medtronic, supra*, pág. 771. No obstante, para beneficiarse de la presunción de despido injustificado, el empleado tiene inicialmente la carga de demostrar que fue despedido. *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894 (2011).

Ahora bien, el despido no está absolutamente prohibido, siempre que el patrono demuestre la existencia de justa causa. *Romero et als. v. Cabrer Roig et als.*, 191 DPR 643, 651 (2014). Esta defensa comprende aquellas circunstancias no motivadas por razones legalmente prohibidas ni por el mero capricho patronal, así como aquellas que afecten el funcionamiento normal del establecimiento, como un patrón de conducta impropia o desordenada; desempeño deficiente o negligente, o violaciones reiteradas a normas razonables y notificadas al empleado, entre otros. Art. 2 de la *Ley sobre Despidos Injustificados, supra*, sec. 185b.

El concepto de despido no se limita a la cesantía, pues incluye la suspensión indefinida o mayor de tres (3) meses y la renuncia provocada por actuaciones patronales dirigidas a forzarla, como la imposición de condiciones laborales más onerosas, reducción salarial, degradación o humillaciones sustanciales. Art. 5 de la *Ley de indemnización por despido sin justa causa, supra*, sec. 185e; *Rivera Figueroa v. The Fuller Brush Co., supra; León Torres v. Rivera Lebrón*, 204 DPR 20 (2020). Esta modalidad, conocida como despido constructivo, requiere actuaciones patronales de tal magnitud que

una persona razonable se vería forzada a abandonar el empleo. *Íd.* Es decir, no basta cualquier molestia o situación antipática. *Íd.*

### C. Discrimen en el empleo por razón de discapacidad

La Constitución del Estado Libre Asociado de Puerto Rico reconoce la dignidad e igualdad del ser humano y prohíbe el discrimen. Art. II, sec. 1, Const. ELA, LPRA, Tomo 1, ed. 2016. Dicho principio se extiende al ámbito laboral mediante legislación protectora, entre ellas, la *Ley para Prohibir el Discrimen contra las Personas con Impedimentos Físicos, Mentales o Sensoriales*, Ley Núm. 44 de 2 de julio de 1985, según enmendada, 1 LPRA sec. 501 *et seq.* Este estatuto tiene como propósito garantizar igualdad de oportunidades y prohibir el discrimen contra personas con discapacidad física, mental o sensorial en el empleo. *Guardiola Álvarez v. Dpto. de la Familia*, 175 DPR 668, 683 (2009); *Ríos v. Cidra Mfg. Oper. of PR Inc.*, 145 DPR 746, 749 (1998).

Para quedar cobijado por esta ley protectora, el empleado debe demostrar que es una persona con discapacidad y que está cualificado para realizar las funciones esenciales del puesto, con o sin acomodo razonable.[96] *García v. Darex PR Inc.*, 148 DPR 364 (1999). El estatuto ampara a quienes tengan un historial de discapacidad o sean percibidos como si lo tuvieran, aun cuando no exista tal condición. En esta última modalidad, la protección aplica cuando el patrono cree erróneamente que el empleado tiene una

---

[96] El término acomodo razonable significa:

> [El] ajuste lógico adecuado o razonable que permite o faculta a una persona cualificada para el trabajo, con limitaciones físicas, mentales o sensoriales ejecutar o desempeñar las labores asignadas a una descripción o definición ocupacional. Incluye ajustes en el área de trabajo, construcción de facilidades físicas, adquisición de equipo especializado, proveer lectores, ayudantes, conductores o intérpretes y cualquier otra acción que razonablemente le facilite el ajuste a una persona con limitaciones físicas, mentales o sensoriales en su trabajo y que no representa un esfuerzo extremadamente oneroso en términos económicos.
>
> Significará, además, la adaptación, modificación, medida o ajuste adecuado o apropiado que deben llevar a cabo las instituciones privadas y públicas para permitirle o facultarle a la persona con impedimento cualificada a participar en la sociedad e integrarse a ella en todos los aspectos, inclusive, trabajo, instrucción, educación, transportación, vivienda, recreación y adquisición de bienes y servicios. 1 LPRA sec. 501.

discapacidad que limita sustancialmente una actividad principal de vida, o cuando considera que un impedimento tiene un impacto mayor. *Sutton v. United Air Lines, Inc.*, 527 US 471 (1999).

La precitada Ley exige que los patronos adopten medidas afirmativas, como la concesión de acomodos razonables que permitan a las personas con discapacidad desempeñar sus funciones laborales al máximo de su productividad. *Guardiola Álvarez v. Dpto. de la Familia, supra*, págs. 685-686. Ello, siempre que no represente un esfuerzo económico extremadamente oneroso para el patrono. *Íd.*

En ese contexto, la *Americans with Disabilities Act* (ADA), 42 USC sec. 12111(10), define el concepto de *undue hardship* como aquella acción que requiera dificultad o gasto significativo, considerando la naturaleza, costo e impacto del acomodo en las operaciones del patrono, los recursos financieros del patrono, el tamaño de la empresa, el número de empleados y la estructura organizacional.

Una vez el empleado solicita un acomodo razonable, el patrono viene obligado a iniciar un proceso interactivo para evaluar la viabilidad del remedio solicitado y la forma en que puede concederse. A. Acevedo Colom, *Legislación Protectora del Trabajo Comentada*, 8va ed., 2005, pág. 286. Durante este proceso, el patrono puede requerir información para evaluar el acomodo, mientras que el empleado tiene el deber de suministrarla, siempre que sea necesaria y esté relacionada con la condición de que origina la discapacidad. *Íd.*

Una vez el empleado provee la información requerida, ambas partes deben identificar alternativas de acomodo razonable. *Íd.* No obstante, el patrono no incurre en responsabilidad por no iniciar el proceso interactivo cuando, de la información disponible, surge que no existe un acomodo razonable posible. *Íd.* En tales casos, "[el] empleado debe demostrar que existe una alternativa de acomodo razonable para que pueda fijarse responsabilidad al patrono". *Íd.*, págs. 286-287. Si se demuestra que el empleado podía desempeñar

las funciones básicas del puesto con tal acomodo alternativo y el patrono no lo concedió, incurrirá en responsabilidad. *Íd.*, pág. 287.

**III.**

En el presente recurso, la señora Maldonado Santiago planteó que el TPI erró al desestimar su *Querella*, al concluir que no medió discrimen por razón de impedimento ni represalias por solicitar acomodo razonable o reclamar la reinstalación de su empleo.

En cuanto al primer señalamiento de error, relativo a la apreciación de la prueba, es norma trillada que las determinaciones de hechos y la adjudicación de credibilidad del tribunal *a quo* están revestidas de una presunción de corrección, por estar en mejor posición para aquilatar la prueba testifical. Las determinaciones consignadas en la *Sentencia* se sostuvieron en la apreciación de la prueba testifical, y la apelante se limitó a manifestar su desacuerdo, sin demostrar error manifiesto, prejuicio, parcialidad o pasión. Tal inconformidad, por sí sola, no justifica la intervención apelativa.

En el caso que nos ocupa, el TPI concluyó que no medió un despido injustificado en la modalidad de despido constructivo. Al respecto, es menester precisar que, aun cuando la figura del despido constructivo no resultaba aplicable a los hechos de este caso, ello no altera la corrección del resultado final alcanzado por el foro apelado. Pues, la terminación de la relación laboral de la apelante como empleada del Hospital ocurrió como consecuencia del abandono de empleo. La prueba estableció que el 10 de enero de 2022, el Hospital notificó a la señora Maldonado Santiago la denegatoria del acomodo razonable solicitado y le concedió un término hasta el 19 de marzo de 2022 para presentar documentación médica adicional, notificar cambios en su condición o solicitar el beneficio de SINOT. Dicho término transcurrió sin que la señora Maldonado Santiago realizara gestión alguna dirigida a su reincorporación o a comunicarse con el patrono.

En ese contexto, resulta inane el argumento de que las supervisoras le solicitaron la renuncia, puesto que la apelante reconoció que no realizó acción ulterior al respecto y permaneció laborando con el acomodo razonable en el turno nocturno. Del mismo modo, tampoco altera esta conclusión la alegación de que no tenía incidentes disciplinarios y que, posteriormente, trabajó en la misma sala de emergencias operada por otro patrono.

Pues, el asunto determinante consistió en que el fin de la relación de empleo de la señora Maldonado Santiago con el Hospital ocurrió cuando esta no se comunicó con el patrono ni solicitó los beneficios disponibles dentro del término concedido en la reunión de enero de 2022. Incluso, la apelante reconoció que el acomodo razonable que su médico recomendó no era permanente, ya que podía variar aproximadamente cada seis (6) meses, sin embargo, no se comunicó con el recurrido para informar cambio alguno en su situación. Ante ello, la relación laboral no culminó por una actuación del Hospital, sino por la inacción de la apelante para preservar su empleo.

En lo concerniente al señalamiento de error relativo al discrimen por razón de discapacidad, el TPI tampoco erró al concluir que la denegatoria del acomodo razonable no constituyó discriminación. Para que prospere una reclamación bajo la *Ley para Prohibir el Discrimen contra las Personas con Impedimentos Físicos, Mentales o Sensoriales, supra*, el empleado tiene que demostrar que era una persona con impedimento cualificada para desempeñar las funciones esenciales del puesto, con o sin acomodo razonable.

En este caso, la apelante solicitó cuatro (4) acomodos razonables: trabajar en turno nocturno de 7:00 p.m. a 7:00 a.m.; permanecer siempre acompañada por si presentaba algún síntoma; ser trasladada a la sala de emergencias, ya que el área de medicina conductual exacerbaba su condición, y no intervenir con las

restricciones médicas. Su médico, quien admitió que desconocía cómo operaba el Hospital, indicó que podía ejercer sus funciones esenciales si se concedían dichos acomodos.

La prueba acreditó que dicho acomodo razonable resultaba incompatible con las funciones esenciales del puesto. Primero, la señora Rodríguez Rivera, a cuyo testimonio el TPI le otorgó mayor credibilidad, declaró que, a partir de las 11:00 p.m. durante el turno nocturno, no había médico evaluador en el área de medicina conductual. Por ello, los pacientes que requerían servicios de salud mental permanecían en la sala de emergencias hasta las 11:00 a.m.

Ante ese escenario, la señora Rodríguez Rivera planteó que el personal de enfermería asumía funciones de intervención directa con los pacientes que incluía la evaluación inicial, el registro corporal y de pertenencias, la implementación de restricciones físicas, así como la realización de esfuerzos físicos cuando las circunstancias lo ameritaban. Es decir, durante el turno nocturno, la dinámica operacional de la sala de emergencias exigía una intervención directa con los pacientes en crisis de salud mental.

La señora Rodríguez Rivera, quien tenía conocimiento directo del funcionamiento del Hospital y de las exigencias operacionales del turno nocturno, explicó que el acomodo razonable solicitado, consistente en trasladar a la apelante fuera del área de medicina conductual debido a que exacerbaba su condición, generó preocupación. Ello, porque el Hospital se especializaba precisamente en la atención de pacientes que requerían servicios de salud mental y durante el turno nocturno en la sala de emergencias se atendían los casos más críticos de salud mental. Esta sostuvo que estos pacientes constituían una población a la cual el Hospital no podía excluir de ofrecer servicios.

Segundo, la señora Rodríguez Rivera explicó que el personal de enfermería en la sala de emergencias trabajaba de manera individual

en áreas separadas, lo cual impedía garantizar que la apelante permaneciera acompañada en todo momento. Aunque la señora Maldonado Santiago alegó que en la sala de emergencias laboraban varias personas, ello no implicaba que pudiese asegurarse la presencia constante de otro empleado.

Tercero, el médico de la apelante recomendó que el Hospital no interviniera en las restricciones médicas. La naturaleza categórica de tal recomendación significaba que el apelado no podía evaluar acomodos razonables alternativos, tal como reconoció la señora Maldonado Santiago en su testimonio, que permitieran que esta pudiera desempeñar las funciones esenciales del puesto. Estas admisiones sustentaron la conclusión de que el *acomodo* solicitado no resultaba *razonable* dentro de la operación del Hospital.

La evidencia demostró que el Hospital determinó que el acomodo razonable solicitado de traslado a la sala de emergencias en un turno nocturno, unido a la exigencia de acompañamiento constante y a la imposibilidad de intervenir con las restricciones médicas dispuestas por el doctor de la querellante, eliminaba las funciones de la señora Maldonado Santiago y no permitía que se auscultaran medidas alternativas para que pudiera ejercer las funciones esenciales de su puesto como enfermera. Por consiguiente, la denegatoria del acomodo razonable no constituyó discrimen por razón de discapacidad.

De otra parte, el TPI tampoco erró al concluir que no medió represalias. La prueba no estableció un nexo causal entre la solicitud de acomodo razonable y la terminación de la relación laboral. Por el contrario, el expediente reflejó que el Hospital participó en el proceso interactivo, solicitó información adicional y concedió un término adicional para que la apelante presentara documentación o gestionara el beneficio de SINOT y retuviera su empleo. La

terminación del vínculo laboral ocurrió luego de que la apelante no realizara gestión alguna dentro del término concedido.

Por tanto, la prueba sostiene la conclusión de que no medió despido injustificado, discrimen ni represalias.

**IV.**

Por los fundamentos que anteceden, se confirma la determinación apelada.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones